UNITED STATES DISTRICT COURT      <u>FOR ONLINE PUBLICATION ONLY</u>
EASTERN DISTRICT OF NEW YORK

---

EDWIN CRUZ,

                Petitioner,

     – versus –

MICHAEL P. McGINNIS, Superintendent,
Southport Correctional Facility,[1]

                Respondent.

---

MEMORANDUM
<u>AND ORDER</u>
11-CV-3442 (JG)

A P P E A R A N C E S :

        EDWIN CRUZ
              #04-A-0512
              Southport Correctional Facility
              P.O. Box 2000
              Pine City, NY 14871
              Petitioner, *Pro Se*

        CHARLES J. HYNES
              Kings County District Attorney
              350 Jay Street at Renaissance Plaza
              Brooklyn, NY 11201
        By:    Amy Appelbaum
              Assistant District Attorney
              *Attorney for Respondent*

JOHN GLEESON, United States District Judge:

        Edwin Cruz, who is currently incarcerated at Southport Correctional Facility,

brings this petition, *pro se*, for a writ of habeas corpus pursuant to 28 U.S.C. § 2254.  Cruz was

sentenced by the Supreme Court for Kings County to an indeterminate prison term of 20 years to

life upon his plea of guilty to murder in the second degree.  Cruz now seeks habeas relief from

his conviction.  Cruz appears to present three main arguments in support of his petition: (1) his

---

[1]      I have amended the case caption to name as the respondent the "state officer who has custody" of
Cruz to accord with Rule 2(a) of the Rules Governing Section 2254 Cases in the United States District Courts.

confession to the police was unconstitutionally obtained; (2) his counsel was ineffective in failing to obtain an order suppressing that confession; and (3) his waiver of his right to appeal was defective because it was not knowing and voluntary.  Cruz also argues that he should be awarded a default judgment because the state never responded to a habeas petition that he allegedly filed in 2008.  For the reasons stated below, the petition is denied.

BACKGROUND

A.      *The Offense Conduct*

The record establishes that the prosecution was prepared to present the following evidence against Cruz, if the case had gone to trial.[2]  On November 12, 1994, at approximately 6:00 P.M., near the intersection of Autumn Avenue and Etna Street in Brooklyn, Cruz had an argument with Juan Santiago.  After the argument, Cruz ran to his house, grabbed a .350 Magnum from inside, and returned to that same street corner.  He pointed the gun at Santiago, who started to run away.  Cruz fired the gun, and Santiago fell.  Cruz then shot Santiago again, at least once.  Santiago sustained multiple gunshot wounds to the head and was pronounced dead at the scene.  Cruz fled to the Dominican Republic the next day and remained there for two years before returning to the United States.

B.      *Cruz's Post-Arrest Statements*[3]

Cruz was arrested in the lobby of his apartment building in the Bronx at about 1:25 P.M. on September 8, 2002 – about eight years after Santiago's killing.  The arresting officer, New York Police Detective Steven Amalfitano, escorted Cruz to the 75th Precinct in Brooklyn and placed Cruz in an interview room.  At around 2:45 P.M., Amalfitano returned to

---

[2]      *See* Resp. Br. at 2 (ECF No. 4); *see also* Hearing Trans. at 25-26 (Resp. Ex. A, ECF No. 4-1 at 1) (Cruz's post-arrest statement made to police); Plea Trans. at 5-6 (Resp. Ex. A, ECF No. 4-1 at 57); Sentencing Trans. at 6-9 (Resp. Ex. A, ECF No. 4-1 at 71).

[3]      The content and circumstances of Cruz's post-arrest statements are detailed in the transcript of the suppression hearing.  *See* Hearing Trans. at 13-27, 33-37, 42-50.

the interview room where Cruz was waiting.  Amalfitano testified at the suppression hearing that

the first thing he did upon entering the interview room was to read Cruz his *Miranda* warnings

directly from a card.  After reciting each right, he asked if Cruz understood, and Cruz said he did.

Amalfitano then handed Cruz the card and asked him to read the *Miranda* warnings that were

printed in Spanish on the other side of the card.  Cruz repeated out loud each warning.  Then,

Amalfitano had Cruz put the date, time, and answer to every question on the *Miranda* card and

sign his name – on both the English side and the Spanish side of the card.[4]

        After Cruz waived his *Miranda* rights (verbally and by writing "yes" next to each

question and signing his name), he gave an oral statement to Amalfitano, describing the murder

of Santiago.  The statement began at about 2:50 P.M., and lasted about 35 to 40 minutes.

Amalfitano then asked Cruz whether he would be willing to write out a statement.  Cruz said he

could not write it himself, so Amalfitano wrote it instead, and they went back over the details of

the incident as Amalfitano wrote it down.  After Amalfitano had reduced the statement to

writing, he read it back to Cruz and asked if he wanted to make any changes or alterations to

correct it.  Cruz indicated he did not.  Then both Cruz and Amalfitano signed the statement.  It

was then about 4:00 P.M.  At the suppression hearing, Amalfitano read this written statement out

loud in full to the court.[5]

        Cruz's written statement described the murder as follows.  Santiago had moved

into Cruz's neighborhood a few months before the incident, and Santiago frequently threatened

---

[4]      A copy of this *Miranda* warnings card, which was Exhibit 2 at the state court *Huntley* hearing, was
provided to this Court after oral argument (ECF No. 7-1).  The copy shows that on each side of the card, Cruz wrote
"9[-]8-02-245PM" and signed his name, and he wrote "yes" after the question "Do you understand?" following each
of the six rights on the English side of the card, and "si" after the question "Comprende usted?" following each of
the six rights on the Spanish side of the card.

[5]      *See* Hearing Trans. at 25-26 (verbatim recitation of Cruz's written statement).  A copy of this
written statement, which was Exhibit 3 at the state court *Huntley* hearing, was provided to this Court after oral
argument (ECF No. 7-2).

and harassed him.[6]  On the day of the murder, Santiago hit Cruz and told him he was going to

kill him.  Santiago told Cruz that his brother had a gun, and when he came back, he would kill

Cruz.  That's when Cruz ran to his house, grabbed the gun, and returned to the corner.  Santiago

didn't have anything in his hands.  Cruz pointed the gun at Santiago and Santiago started to run

away.  Cruz shot Santiago once and he fell.  Then Cruz shot him again.  Cruz disposed of the gun

somewhere in Brooklyn and fled to the Dominican Republic, where he stayed for almost two

years before returning to New York.[7]

   In addition to the oral and written statements that Cruz made to Detective

Amalfitano, Cruz also made a videotaped statement to representatives from the Kings County

District Attorney's office in the early morning hours of September 9, 2002.[8]  In this videotaped

statement, Cruz again waived his *Miranda* rights and then went on to describe the events of the

murder very similarly to the written statement recorded by Detective Amalfitano.  The state trial

court viewed this videotape during the suppression hearing.

C.   *Conviction and Direct Appeal*

   On December 9, 2003, Cruz pled guilty to second-degree murder, in reliance on

the trial court's promise to sentence him to no more than 20 years to life.[9]  In conjunction with

his guilty plea, Cruz signed a waiver of his right to appeal, and verbally indicated that he

---

[6]   Cruz's brother submitted a letter which was before the court at sentencing suggesting that Santiago taunted and harassed Cruz for being Dominican in a mostly Puerto Rican neighborhood.  *See* Def's Ap. Br. at 12-13 (Resp. Ex. B, ECF No. 4-2 at 1).

[7]   Although the hearing transcript recorded Amalfitano as reading from Cruz's written statement that Cruz stayed in the Dominican Republic for "four years," *see* Hearing Trans. at 26, the actual written statement says Cruz stayed there "for almost 2 years" (ECF No. 7-2).  And in both his videotaped statement to the assistant district attorney and his presentence interview, Cruz stated that he returned to New York in 1996, two years after the murder.  *See* Def's Ap. Br. at 8.

[8]   A copy of this videotape, which was Exhibit 5 at the state court *Huntley* hearing, was provided to this Court after oral argument, in conjunction with respondent's letter dated November 18, 2011 (ECF No. 6).

[9]   *See* Plea Trans. at 8.  The plea agreement was reached between the court and Cruz over the government's objection.  *Id.* at 6.  The government told the court that its evidence showed that after Santiago had fallen to the ground from Cruz's first gunshot, Cruz grabbed Santiago by the head and fired three more shots into his head at close range.  *Id.* at 5; *see also* Sentencing Trans. at 6-7, 9.

understood that "[b]y signing that paper, you're waiving that right [to appeal]," and that, "[i]n

other words, this case will not be heard by any other court."  Plea Trans. at 12.

At the January 22, 2004 sentencing proceeding, the victim's sister spoke to

request the maximum sentence, and the prosecution and defense counsel each argued for

maximum and minimum sentences, respectively.  Cruz himself also spoke, and apologized for

his crime.  Among other things, Cruz said

> Once again, I apologize and I am very sorry.  Once again, I
> know with that I cannot return your brother.  But I didn't want this
> to happen this way, ever.  It happened because I was nervous and
> the pressure.  I told your brother I did not want a problem with
> him.  I told him many times.  I was in fear for my life, because
> your brother had a bad temper.
> I have a good temper.  And I do tell people, "Leave me
> alone, I don't want to have a problem."  But I saw his attitude and I
> feared for myself.  And he told me that he was going to kill me,
> and he told me many times.  He swear that – and he got on his
> knee and he swear.  And he [broke my] glasses . . . and he told me,
> "I'm going to kill you."  I was afraid.  I feared for my life.
> . . . .
> . . . If by me serving the maximum sentence would make
> them feel better, then let justice be served.  I feel very bad.  I have
> nothing else to say.  Only that I'm very sorry.

Sentencing Trans. at 15-16.  The trial court sentenced Cruz to 20 years to life, the maximum

sentence available in light of the promise the court had made to Cruz at the time of his plea.  The

court said that "at 24 years old no one should have to tell you that murder is wrong.  The only

mitigating factor is your youth at the time of the commission of the offense and the fact that you

have no criminal history."  *Id.* at 17.

Cruz appealed his conviction to the Appellate Division, Second Department.  His

appellate counsel, who did not represent Cruz in the trial court, made three arguments on appeal:

(1) in light of Cruz's statements to the Probation Department and at sentencing suggesting

provocation and the absence of an intent to kill, the court should not have imposed sentence

without ensuring Cruz's guilty plea was voluntary, knowing, and intelligent; (2) Cruz's sentence of 20 years to life was excessive; and (3) the court improperly imposed a $210 surcharge and victim assistance fee.  Def's Ap. Br. at i-ii.

On January 10, 2006, the Appellate Division agreed with Cruz's third point, and modified the judgment to reduce the surcharge and victim assistance fee from a sum of $210 to $155 to accord with the governing law at the time of Cruz's crime.  *See People v. Cruz*, 25 A.D.3d 565, 566 (2d Dep't 2006).  The court then affirmed the judgment as modified, rejecting Cruz's other arguments.  *Id.*  The court rejected Cruz's claim that his sentence was excessive on the ground that the claim was not properly before it because Cruz had waived his right to appeal. *Id.*  The court rejected Cruz's claim regarding the voluntariness of his plea by saying that "[t]he defendant's remaining contention is without merit."  *Id.*  On March 15, 2006, the New York Court of Appeals denied Cruz's application for leave to appeal.  *See People v. Cruz*, 6 N.Y.3d 832 (2006).

D.      *State Collateral Proceedings*

1.      *Cruz's First § 440 Motion*

While his direct appeal was still pending, Cruz filed a *pro se* motion dated October 17, 2005, in the Supreme Court for Kings County, seeking to vacate his conviction pursuant to N.Y.C.P.L. § 440.10.[10]  In that motion, Cruz made three claims: (1) his guilty plea was not knowing and voluntary because the court did not make further inquiry to ensure he possessed the requisite intent to kill; (2) his trial counsel was ineffective in failing to negotiate a plea agreement; and (3) his statement to police was unconstitutionally obtained.

---

[10]      *See* Cruz's First § 440 Mo. (Resp. Ex. D, ECF No. 4-2 at 63).

The § 440 court denied the motion in full as procedurally barred.[11]  It denied Cruz's claim that the trial court failed to ensure that his plea was knowing, voluntary, and intelligent on the ground that the Appellate Division, which had decided Cruz's direct appeal while the § 440 motion was pending, had rejected that claim on the merits.  *See* N.Y.C.P.L. § 440.10(2)(a).  The court denied the other two claims on the ground that they could have been raised on direct appeal but were not.  *See id.* § 440.10(2)(c).  Specifically, the court found that defense counsel's plea negotiations appeared in the minutes of the plea proceeding, and the suppression hearing minutes contained all of the information surrounding the taking of defendant's post-arrest statements, and Cruz did not even attempt to justify his failure to raise these claims on direct appeal.  The court therefore denied in full Cruz's motion to vacate his conviction.

2.      *Cruz's Second § 440 Motion*

By papers dated November 5, 2007, Cruz moved for a second time in the trial court to vacate his conviction pursuant to N.Y.C.P.L. § 440.10.[12]  Cruz raised three grounds on which to vacate his conviction: (1) his statement to police was unconstitutionally obtained; (2) his plea was defective because the waiver of his right to appeal was not knowing and voluntary; (3) his counsel was ineffective in failing to obtain an order suppressing Cruz's post-arrest statements and failing to challenge the sufficiency of the state's evidence.  On May 20, 2008, the Supreme Court of Kings County denied Cruz's second § 440 motion in full, saying "[b]ecause the claims were either raised in defendant's prior C.P.L. § 440.10 motion or could have been

---

[11]      *See* Order Denying First § 440 Mo. (Resp. Ex. G, ECF No. 4-2 at 94).
[12]      *See* Cruz's Second § 440 Mo. (Resp. Ex. H, ECF No. 4-2 at 97).

raised therein, and because the claims could have been raised on direct appeal, the motion must be denied."[13]

E.      *The Present Petition*

Cruz filed this petition for federal habeas relief on July 11, 2011.[14]  He again asserts that (1) his post-arrest statements were unconstitutionally obtained; (2) his counsel was ineffective in failing to obtain an order suppressing those statements; and (3) the waiver of his right to appeal was not knowing and voluntary.  Oral argument on the petition was held on November 16, 2011.  Cruz appeared by video conference and communicated through a Spanish interpreter.

DISCUSSION

A.      *The Timeliness of the Petition*

As part of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Congress enacted a one-year statute of limitations for federal habeas corpus petitions brought by state prisoners.  *See* 28 U.S.C. § 2244(d)(1).  For purposes of this petition, the limitations period runs from "the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review."  *Id.* § 2244(d)(1)(A).[15]

_____

[13]     *See* Order Denying Second § 440 Mo. (Resp. Ex. J, ECF No. 4-2 at 132) (citing N.Y.C.P.L. § 440.10(2)(c), 440.10(3)(c)).

[14]     *See* Pet. at 1, 23 (ECF No. 1).  Under the "prison mailbox" rule, a *pro se* prisoner's habeas petition is deemed filed at the moment he gives it to prison officials for forwarding to the court.  *See Noble v. Kelly*, 246 F.3d 93, 97-98 (2d Cir. 2001).

[15]     28 U.S.C. § 2244(d)(1) provides as follows:

A 1-year period of limitation shall apply to an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court. The limitation period shall run from the latest of—

(A) the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;

8

However, the federal habeas statute tolls the limitations period for "[t]he time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending." *Id.* § 2244(d)(2).

A judgment becomes final for purposes of § 2244(d)(1)(A) when the Supreme Court denies certiorari or when the time for seeking Supreme Court certiorari has expired. *Williams v. Artuz*, 237 F.3d 147, 151 (2d Cir. 2001). Judgment was entered against Cruz on January 22, 2004. On January 10, 2006, the Appellate Division, Second Department affirmed his conviction. *See Cruz*, 25 A.D.3d at 566. On March 15, 2006, the New York Court of Appeals denied Cruz's application for leave to appeal. *See Cruz*, 6 N.Y.3d at 832. Since Cruz did not petition for a writ of certiorari, his conviction became final 90 days after the New York Court of Appeals denied his application for leave to appeal. *Fernandez v. Artuz*, 402 F.3d 111, 112 (2d Cir. 2005). Cruz's conviction therefore became final on June 13, 2006.

However, on October 17, 2005 – while his direct appeal was still pending – Cruz moved to vacate his judgment of conviction pursuant to N.Y.C.P.L. § 440.10. This collateral proceeding tolled Cruz's limitations period. 28 U.S.C. § 2244(d)(2). The trial court denied this § 440 motion on October 6, 2006. At the end of its order denying relief, the court advised Cruz of his right to apply for a certificate granting leave to appeal in the Appellate Division.

---

(B) the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such State action;

(C) the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or

(D) the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.

Cruz does not claim that there was an unconstitutional state-created impediment to his seeking habeas relief, that the rights he asserts were newly recognized by the Supreme Court, or that the factual predicate of his claims was not discoverable prior to his conviction becoming final. Accordingly, subsection (A) governs the limitations period of Cruz's claim.

However, Cruz never filed an application for leave to appeal in the Appellate Division.  *See* Resp. Br. at 4-5.[16]

"New York law requires that a person who wishes to appeal the denial of a C.P.L. [§] 440.10 motion to vacate a judgment make an application for a certificate granting leave to appeal to the intermediate appellate court within thirty days after service upon the defendant of a copy of the order sought to be appealed."  *Wedra v. Lefevre*, 988 F.2d 334, 339 (2d Cir. 1993); *see* N.Y.C.P.L. § 460.10(4)(a) (in order to appeal to an intermediate appellate court an order denying a § 440.10 motion to vacate a judgment, "[w]ithin thirty days after service upon the defendant of a copy of the order sought to be appealed, the defendant must make application, pursuant to [N.Y.C.P.L. §] 460.15, for a certificate granting leave to appeal to the intermediate appellate court").  The record does not indicate when the § 440 court effected "service upon" Cruz of its order denying his § 440 motion.  *See* N.Y.C.P.L. § 460.10(4)(a).  Although the order is dated October 6, 2006, a stamp by the county clerk indicates the order was "entered" on October 10, 2006.  *See* Order Denying First § 440 Mo. at 3.  Because it does not alter the outcome here, I will assume the state court served Cruz with a copy of the order on the later date, that is, October 10, 2006.[17]

_____

[16]    Apparently Cruz served a copy of a motion seeking leave to appeal on the Kings County District Attorney's office and also on the Supreme Court at 320 Jay Street.  *See* Resp. Br. at 4.  The Supreme Court then forwarded the copy it received to the Kings County District Attorney's office.  *Id.* at 5.  However, Cruz never filed the motion in the Appellate Division, where he had been instructed to file it.  *See* Order Denying First § 440 Mo. at 3; *see also* N.Y.C.P.L. § 460.15 ("An application for . . . a certificate [seeking leave to appeal to an intermediate court] must be made in a manner determined by the rules of the appellate division of the department in which such intermediate appellate court is located.");  N.Y. Ct. Rules § 670.12(b)(1)-(2) ("An application pursuant to [N.Y.C.P.L. §§] 450.15 and . . . 460.15 for leave to appeal to this court [Appellate Division, Second Department] from an order . . . shall be addressed to the court . . . .").  Neither the Supreme Court nor the district attorney's office forwarded the motion to the Appellate Division.  In fairness, the district attorney should have taken steps to make sure the application for leave to appeal was delivered to the Appellate Division.  Because, in my view, Cruz's claims are both time-barred and without merit in any event, I need not address whether the district attorney's inaction when it received a misdirected leave application warrants equitable tolling.

[17]    Although the "prison mailbox" rule holds that AEDPA's tolling period begins when the state prisoner hands his state collateral petition to his jailer for forwarding to the court, *see Fernandez*, 402 F.3d at 116, there is no "reverse" prison mailbox rule.  That is, AEDPA's tolling period ends when a state court's final order is

Therefore, the period in which Cruz *could have* sought leave to appeal the trial court's denial of his § 440 motion expired 30 days after October 10, 2006.  Assuming Cruz's § 440 motion remained "pending" throughout this 30-day period for purposes of 28 U.S.C. § 2244(d)(2),[18] Cruz's § 440 proceedings were clearly concluded at the expiration of this 30-day period.  Thus, even with the most generous interpretation of both the statutory tolling provision and the facts of this case, the one-year limitations period for Cruz's habeas petition began to run 30 days after October 10, 2006, that is, on November 9, 2006.  Accordingly, absent any further tolling, Cruz had until November 9, 2007 to file his habeas petition in federal court.

Cruz filed a second § 440 motion on November 5, 2007.  The pendency of this collateral proceeding tolled the time remaining in Cruz's one-year AEDPA statute of limitations period.  Cruz's second § 440 motion was denied by the state trial court on May 20, 2008.  Cruz requested leave to appeal to the Appellate Division, which was denied on September 5, 2008.[19]  At that point, Cruz had no further rights of appeal.  *See Clark v. McKinney*, No. 05-CV-5585, 2007 WL 2126273, at *4-5 (E.D.N.Y. July 24, 2007).  Accordingly, Cruz's one-year limitations period restarted on September 5, 2008.  *See Bennett*, 199 F.3d at 120 ("[A] state-court petition

---

filed, not the date on which an incarcerated petitioner receives a copy of the decision. *See Geraci v. Senkowski*, 211 F.3d 6, 9 (2d Cir. 2000).

[18]        *See Saunders v. Senkowski*, 587 F.3d 543, 548 (2d Cir. 2009) ("[A] § 440.10 motion is 'pending' for purposes of AEDPA at least from the time it is filed through the time in which the petitioner could file an application for a certificate for leave to appeal the . . . denial of the motion." (citing *Bennett v. Artuz*, 199 F.3d 116, 120 (2d Cir. 1999), *aff'd on other ground*, 531 U.S. 4 (2000))).  *But see id.* at 549 ("[T]he one-year AEDPA limitations period is not tolled by the thirty-day period in which the petitioner could have filed, but did not file, a motion for reconsideration of the New York State court's denial of his post-conviction motion under New York Criminal Procedure Law § 440.10."); *Smaldone v. Senkowski*, 273 F.3d 133, 138 (2d Cir. 2001) (holding that the AEDPA limitations period is not tolled during the time in which a petition for a writ of certiorari to the United States Supreme Court could have been filed with respect to a state collateral motion).  *See generally Carey v. Saffold*, 536 U.S. 214, 219-20 (2002) ("[A]n application is pending as long as the ordinary state collateral review process is 'in continuance' – *i.e.*, 'until the completion of' that process.  In other words, until the application has achieved final resolution through the State's post-conviction procedures, by definition it remains 'pending.'" (quoting Webster's Third New International Dictionary 1669 (1993))); *Bennett*, 199 F.3d at 120 ("[A] state-court petition is 'pending' from the time it is first filed until [the time it is] finally disposed of and further appellate review is unavailable under the particular state's procedures.").

[19]        *See* Order Denying Lv. To App. (Resp. Ex. K, ECF No. 4-2 at 134).

11

[ceases to be] 'pending' . . . [when] further appellate review is unavailable under the particular state's procedures.").

Cruz filed the instant petition on July 11, 2011.  He therefore filed this petition about 2 years and 10 months after the conclusion of all of his state collateral proceedings. Assuming time remained in Cruz's statute of limitations period at the completion of his second § 440 proceedings (and it appears Cruz had at most only four days left at that time), his additional delay of almost three years after that point renders his petition untimely under AEDPA's one-year statutory limitations period.

AEDPA's one-year limitations period is subject to equitable tolling.  *Holland v. Florida*, 130 S. Ct. 2549, 2560 (2010).  Equitable tolling is available only if the petitioner shows "'(1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in his way' and prevented timely filing."  *Id.* at 2562 (quoting *Pace v. DiGuglielmo*, 540 U.S. 408, 418 (2005)); *see also Harper v. Ercole*, 648 F.3d 132, 136 (2d Cir. 2011); *Dillon v. Conway*, 642 F.3d 358, 362 (2d Cir. 2011).  Equitable tolling is appropriate only in "rare and exceptional circumstances."  *Harper*, 648 F.3d at 136 (internal quotation marks omitted).

Cruz states in the present petition that he filed a previous petition for habeas corpus in this Court on June 5, 2008.  Pet. at 2.  Such a petition would have been timely, because Cruz's second § 440 motion was still pending in state court at that time.  Cruz does not provide a copy of the petition or any other evidence that it was filed.  Although he states that he mailed copies of the petition both to this Court and to the Kings County District Attorney's office, I have searched this Court's docket and find no record that such a petition was ever filed.  The Kings County District Attorney's office similarly has no record of ever having received a habeas

petition from Cruz aside from the present petition.  Resp. Br. at 6.  Nonetheless, even assuming

that Cruz did file such a petition, that would not warrant equitable tolling of AEDPA's

limitations period for the full amount of time that passed between September 2008 and July

2011, when the present petition was filed.[20]

"[A] petitioner seeking equitable tolling of AEDPA's limitations period must

demonstrate that he acted with reasonable diligence *throughout the period he seeks to toll*."

*Harper*, 648 F.3d at 138 (internal quotation marks omitted) (emphasis added); *see also Jenkins v.*

*Greene*, 630 F.3d 298, 303 (2d Cir. 2010) (extraordinary circumstances do not warrant equitable

tolling "if the petitioner, acting with reasonable diligence, could have filed on time

notwithstanding the extraordinary circumstances" (quoting *Valverde v. Stinson*, 224 F.3d 129,

134 (2d Cir. 2000)) (internal quotation marks omitted)).  "Courts generally have found that

periods of delay lasting for more than a year do not exhibit due diligence."  *Morton v. Ercole*,

No. 08 Civ. 0252 (RJS) (FM), 2010 WL 890036, at *2 (S.D.N.Y. Mar. 10, 2010).  More than

three years elapsed between when Cruz allegedly mailed the first habeas petition and when he

mailed this current petition.  He made no inquiry of this Court regarding the alleged 2008

petition during that entire period.  This long period of inaction reveals that Cruz did not

diligently pursue his rights, making equitable tolling inappropriate. *See Drew v. Dep't of Corr.*,

297 F.3d 1278, 1286-89 (11th Cir. 2002) (one inquiry in sixteen-month period to ascertain status

of first habeas petition insufficient diligence to allow equitable tolling).

Further, Cruz has not alleged nor established that any extraordinary circumstances

prevented him from refiling the petition, once it became clear that the court had not received and

docketed it.  It is well established that a petitioner's *pro* se status and ignorance of the law are

---

[20]     Only *state* collateral review proceedings statutorily toll AEDPA's limitations period.  *See Duncan v. Walker*, 533 U.S. 167, 172 (2001).  Thus Cruz's 2008 *federal* habeas corpus petition, even if properly filed, did not statutorily toll the limitations period.

not, on their own, extraordinary circumstances that would warrant equitable tolling.  *See Jenkins*, 630 F.3d at 303 (equitable tolling does not apply "whenever a petitioner must face the daunting procedural obstacles to obtaining habeas review without the assistance of counsel"); *Smith v. McGinnis*, 208 F.3d 13, 18 (2d Cir. 2000) ("[P]*ro se* status does not warrant equitable tolling."); *Ayala v. Miller*, No. 03-CV-3289 (JG), 2004 WL 2126966, at *2 (E.D.N.Y. Sept. 24, 2004) ("Neither a prisoner's pro se status, nor his lack of expertise, provides a basis for equitable tolling of AEDPA's statute of limitations.").

Cruz has not established that he pursued his rights diligently or that extraordinary circumstances prevented his timely filing. Accordingly, Cruz is not entitled to equitable tolling. The habeas petition is untimely and must be dismissed.

B.      *The Merits*

Even if I were to disregard the untimeliness of Cruz's petition, I would deny it for lack of merit.  As explained below, none of the arguments raised in the petition warrants federal habeas relief.

When a petitioner's claim for habeas relief was previously decided on the merits by a state court, a federal court may grant habeas relief only if the state court's decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d)(1)-(2).[21]  In addition, a federal habeas court must presume all state court factual determinations to be correct, unless the petitioner rebuts the findings by clear and convincing evidence.  *Id.* § 2254(e)(1).

---

[21]      This limitation on relief is frequently referred to as "AEDPA deference."  *E.g.*, *Cullen v. Pinholster*, 131 S. Ct. 1388, 1410 (2011); *Berghuis v. Thompkins*, 130 S. Ct. 2250, 2265 (2010); *Miller-El v. Cockrell*, 537 U.S. 322, 341 (2003).

The Supreme Court has interpreted the phrase "clearly established Federal law" to mean "the holdings, as opposed to the dicta, of [the Supreme Court's] decisions as of the time of the relevant state-court decision." *Williams v. Taylor*, 529 U.S. 362, 412 (2000); *see also Gilchrist v. O'Keefe*, 260 F.3d 87, 93 (2d Cir. 2001). A decision is "contrary to" clearly established federal law if "the state court arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law or if the state court decides a case differently than [the Supreme Court] has on a set of materially indistinguishable facts." *Williams*, 529 U.S. at 413. A decision is an "unreasonable application" of clearly established federal law if a state court "identifies the correct governing legal principle from [the Supreme Court's] decisions but unreasonably applies that principle to the facts of [a] prisoner's case." *Id.* Elaborating on the "unreasonable application" standard, the Supreme Court has held that a habeas court may only "issue the writ in cases where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with [the Supreme Court's] precedents." *Harrington v. Richter*, 131 S. Ct. 770, 786 (2011). "[E]ven a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Id.* at 786.

AEDPA's deferential review applies whenever a state court disposes of a state prisoner's federal claim on the merits, regardless of whether it gives reasons for its determination or refers to federal law in its decision. *See Richter*, 131 S. Ct. at 785; *Sellan v. Kuhlman*, 261 F.3d 303, 312 (2d Cir. 2001).

    1.    Miranda *Claim*

Cruz first argues that his oral, written, and videotaped statements to police and prosecutors the day of his arrest on September 8, 2002 and early on September 9, 2002 were obtained in violation of his *Miranda* and Fifth Amendment rights, because he is a "Spanish-

15

speaking individual from the Domenican [sic] Republic with limited grasp of the English language." *See* Pet. at 8.[22] Cruz stated that he "cannot read nor write English at all," and didn't know what he was signing at the police station "without a translator or without knowledge of the contents of the papers." *Id.* at 5. And he writes that "[a]t the time of the arrest and questioning[,] the Petitioner spoked and wrote no English and was unable to understand what the detectives wrote in the statement or what they say to the Petitioner, or the 'purported' content of the statement that Petitioner signed." *Id.* at 6. Accordingly, Cruz argues that he did not validly waive his *Miranda* rights, and that his statements were involuntary under the circumstances. *Id.*

Cruz raised his *Miranda* claim during pretrial proceedings in the state court. The state court held a *Huntley* hearing on June 30, 2003 to address the admissibility of the statements that Cruz made at the police precinct after his arrest. *See People v. Huntley*, 15 N.Y.2d 72, 77 (1965) (providing, upon request by defense counsel, for a preliminary hearing in which the state judge must find that a defendant's confession was voluntary beyond a reasonable doubt before it may be submitted to a jury at trial).

At the hearing, the state called Detective Amalfitano, the officer who arrested Cruz and elicited his post-arrest statements. Hearing Trans. at 5. Amalfitano testified to the circumstances surrounding Cruz's *Miranda* waiver and the subsequent oral statements made by Cruz and reduced to writing by Amalfitano. After the hearing, the state court ruled that it found Amalfitano to be "credible." *Huntley* Order at 1 (ECF No. 4 App'x at 33). The court then found that "under the totality of the circumstances," Cruz "knowingly, intelligently and voluntarily waived his Miranda rights before making the statements." *Id.* at 4. Cruz did not raise a *Miranda*

---

[22]    Cruz's petition states that he sought the assistance of a fellow inmate, Jose Orraca, who is more familiar with the legal system, to help draft and file his petition. Pet. at 3.

claim on direct appeal, but he did raise it in both of his § 440 motions, both of which were denied as procedurally barred.

   The state court's determination that Cruz knowingly, intelligently, and voluntarily waived his *Miranda* rights prior to making his stationhouse statements was neither an unreasonable application of Supreme Court law nor an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.  *See* 28 U.S.C. § 2254(d).  And Cruz has not rebutted the state court's factual findings by clear and convincing evidence.  *Id.* § 2254(e)(1).

   The record of the suppression hearing indicates that Detective Amalfitano read Cruz his *Miranda* warnings from a card immediately upon entering the interview room at the 75th Precinct.  *See* Hearing Trans. at 17-18, 36, 45.  Amalfitano first read the warnings to Cruz in English.  After each of the six rights, Amalfitano asked "Do you understand?", and in response to each question, Cruz said "yes," indicating he understood the particular right.  *Id.* at 18, 20-21, 43, 48-49.  Amalfitano then asked Cruz to read the warnings written in Spanish on the reverse side of the *Miranda* card.  *Id.* at 19, 49.  Cruz read the warnings in Spanish slightly out loud, "like a mumble to himself," and then repeated each warning in English.  *Id.* at 19.  On both the English and Spanish sides of the *Miranda* card, Cruz wrote the date, time, and answer to each question, and then signed his name.  *Id.*  Cruz then agreed to speak with Amalfitano about the incident, and gave an oral statement that lasted about 35 to 40 minutes.  *Id.* at 21, 23.  Amalfitano then went over the statement again with Cruz as Amalfitano reduced it to writing.  *Id.* at 23. Finally, Amalfitano read back to Cruz the written statement, which Cruz then affirmed as correct and signed his name to it.  *Id.* at 24.

Amalfitano, a monolingual English speaker, testified that he felt that he and Cruz had communicated "fine" the entire day, both at Cruz's apartment and back at the police station. *Id.* at 48 ("As soon as I started speaking with him he seemed to understand me fine and I was able to understand him fine."). Amalfitano said he was "sure [Cruz] understood [him] in English." *Id.* at 47. Nonetheless, Amalfitano had Cruz read the *Miranda* warnings in Spanish as a precaution. *Id.* at 33-34, 47-49. Cruz never asked for an interpreter. *Id.* at 46.

The hearing court also reviewed the videotape of Cruz's oral statement made to prosecutors in the early morning on September 9, 2002. A copy of this same videotape was provided to this Court after oral argument.[23] The approximately nine-minute video shows that at about 12:30 A.M. on September 9, 2002, Assistant District Attorney Maritza Mejia again read Cruz his *Miranda* warnings and, after stating each right, asked Cruz, "Do you understand that?"; Cruz said "yes" each time. Mejia then asked, "Now that I've advised you of all your rights, do you still wish to speak to me at this time?" Cruz answered, "Yeah, I want to speak to you." Cruz then provided a very coherent statement in English describing the murder, as well as Santiago's bullying leading up to the murder and Cruz's subsequent flight to the Dominican Republic. The entire interview took place in English. Cruz asked for clarification of a question only one time, and after Mejia provided this clarification, Cruz's response revealed that he understood the question. This Court concludes that the videotape supports the state court's finding and corroborates Amalfitano's testimony that Cruz spoke and understood English sufficiently to knowingly waive his *Miranda* rights.

In light of the evidence adduced at the suppression hearing and deemed "credible" by the hearing court, Cruz's *Miranda* waiver was undoubtedly knowing, voluntary,

---

[23]     *See* Resp.'s Ltr., Nov. 18, 2011 (ECF No. 6).

and intelligent, and the hearing court's ruling was not an unreasonable application of Supreme Court law.[24]

2.   *Ineffective Assistance of Counsel Claim with Respect to Suppression*

Cruz also suggests in his petition that he was denied the effective assistance of counsel because his trial counsel failed to challenge his post-arrest statement on the grounds that it was obtained in violation of Cruz's constitutional rights under *Miranda*, Fifth Amendment voluntariness, Fourth Amendment seizure, or the Sixth Amendment right to counsel.  *See* Pet. at 13-15.  As noted above, Cruz's counsel did indeed seek and obtain a hearing to address the statement's admissibility.  After the hearing, the trial court denied Cruz's *Miranda* claim and refused to suppress the statement.  The hearing did not reveal any other potential Fifth Amendment, Fourth Amendment, or Sixth Amendment violations in the manner in which the statement was obtained.  After the court's refusal to suppress the statement, Cruz pled guilty to the charge of murder in the second degree based on the court's promise not to sentence Cruz to more than 20 years to life.

Cruz's counsel's performance was not deficient in failing to get the statement suppressed because Cruz's counsel in fact obtained a hearing on the statement's admissibility, and the hearing revealed the potential constitutional objections to the statement to be meritless. *See Strickland v. Washington*, 466 U.S. 668, 688, 694 (1984) (in order to show violation of Sixth Amendment right to effective assistance of counsel, criminal defendant must show that "counsel's performance fell below an objective standard of reasonableness" and that "there is a

---

[24]   Respondent also argues that this claim is procedurally barred because Cruz could have but did not raise it on direct appeal, and the state courts' denial of the claim in Cruz's collateral proceedings on procedural bar grounds constitutes an independent and adequate state law ground of decision, precluding federal habeas review. Resp. Br. at 7. Because I conclude that Cruz's claim lacks merit, I need not address this alternative ground for denying Cruz's claim.

reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different").[25]

      3.    *Appeal Waiver Claim*

      Finally, Cruz argues that his waiver of his right to appeal was invalid because during his plea, the court grouped its explanation of the appeal waiver together with its explanation of the rights that are waived automatically by pleading guilty, and therefore Cruz did not realize that he was giving up something more than what was ordinarily forfeited by a guilty plea.  *See* Pet. at 10-12.

      "Waivers of the right to appeal a sentence are presumptively enforceable." *United States v. Riggi*, 649 F.3d 143, 147 (2d Cir. 2011) (quoting *United States v. Arevalo (Vigil)*, 628 F.3d 93, 98 (2d Cir. 2010)).  Appeal waivers are generally valid so long as they are "knowingly, voluntarily, and competently provided by the defendant."  *United States v. Gomez-Perez*, 215 F.3d 315, 318 (2d Cir. 2000).  The "exceptions to the presumption of the enforceability of a waiver" are very limited.  *Riggi*, 649 F.3d at 147 (quoting *Gomez-Perez*, 215 F.3d at 319).

      The transcript of Cruz's plea belies his claim that the court confusingly lumped its explanation of the appeal waiver together with its explanation of the other trial rights are necessarily waived incident to a guilty plea.[26]  The court first went through the trial rights forfeited by pleading guilty, saying:

        Do you understand that by pleading guilty you're giving up certain rights?

---

[25]    Because Cruz's ineffective assistance of counsel claim is meritless, I need not address respondent's alternative argument that the claim is procedurally barred because it could have been raised in Cruz's direct appeal but was not.  *See* Resp. Br. at 6.

[26]    A Spanish interpreter was present at the plea and translated the entire plea proceedings for Cruz. Plea Trans. at 3.

> You have the right to a trial before a judge or a jury.  At a trial, the witnesses against you would testify.  Your attorney would question the witnesses.  You could call witnesses to testify in your own behalf.  You could also exercise your right to remain silent and present no evidence.  You have the right to make the district attorney prove your guilt beyond a reasonable doubt.
> When you plead guilty, you're waiving all those rights.  Do you understand that?

Plea Trans. at 8-9.  Cruz answered "yes."  *Id.* at 9.

The court then spent the next two-and-a-half pages of transcript discussing numerous other consequences of a guilty plea with Cruz, including Cruz's predicate felon status, potential immigration consequences, and surcharge and victim assistance fee assessments; eliciting Cruz's admission of the essential facts constituting the offense; and cautioning Cruz that it might impose a longer sentence than promised if it turned out that Cruz had a prior felony conviction.  *Id.* at 9-11. Finally, after dealing with all of these other items, the court said as follows:

> You signed a paper called a waiver of appeal.  You have the right to appeal to a higher court from the plea that you have entered and any sentence which can be imposed and any other pretrial rulings that have been made.  By signing that paper, you're waiving that right.  In other words, this case will not be heard by any other court.
> Do you understand that?

*Id.* at 11-12.  Cruz answered "yes."  *Id.* at 12.

As is evident from the transcript, Cruz's claim that the court grouped the right to appeal with the rights that are waived automatically by a guilty plea is meritless.

Further, any constitutional error in accepting Cruz's appeal waiver was surely harmless.  *See Fry v. Pliler*, 551 U.S. 112, 121-22 (2007) (federal habeas relief only warranted where error had a "substantial and injurious effect" on petitioner's conviction (quoting *Brecht v. Abrahamson*, 507 U.S. 619, 623 (1993))); *see also Wood v. Ercole*, 644 F.3d 83, 93-94 (2d Cir.

2011).  Cruz did in fact appeal from his conviction and sentence, and the Appellate Division reviewed the merits of two of the three claims Cruz raised.  *See Cruz*, 25 A.D.3d at 565-66.  The only claim the Appellate Division denied on the basis of Cruz's appeal waiver was his excessive sentence claim, *id.* at 566, which would have had no effect on Cruz's conviction itself.  Therefore, the appeal waiver, even if unconstitutionally obtained, did not deprive Cruz of the benefit of the bargain he struck in pleading guilty.  *See Ruelas v. Wolfenbarger*, 580 F.3d 403, 410-11 (6th Cir. 2009).

        4.     *Request for a Default Judgment*

        Cruz requests a default judgment against the state for its failure to respond to his alleged 2008 habeas petition.  For obvious reasons, a default judgment granting a writ of habeas corpus is exceedingly rare.  *See Bermudez v. Reid*, 733 F.2d 18, 21-22 (2d Cir. 1984) (holding that a default judgment is improper where the government fails to respond to a habeas corpus petition "unless the claimant first establishes 'his claim or right to relief by evidence satisfactory to the court,'" because "were district courts to enter default judgments [in habeas cases] without reaching the merits of the claim, it would be not the defaulting party but the public at large that would be made to suffer" (quoting Fed. R. Civ. P. 55(d))).  And here, a threshold requirement – the filing of a petition – has not even been met.  Neither this Court nor the district attorney has any record of Cruz's having filed a habeas petition in 2008.  Accordingly, his request for a default judgment is denied.

CONCLUSION

        For the reasons stated above, Cruz's petition for habeas corpus pursuant to 28 U.S.C. § 2254 is denied.  Because Cruz has failed to make a substantial showing of a denial of a constitutional right, no certificate of appealability shall issue.  *See* 28 U.S.C. § 2253(c)(2).

So ordered.


John Gleeson, U.S.D.J.

Dated:  November 22, 2011
        Brooklyn, New York